IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JORGE MARTINEZ                        :          CIVIL ACTION
                                      :
            v.                        :
                                      :
SKIRMISH, U.S.A., INC., ET AL.        :          NO.  07-5003

## MEMORANDUM

**Padova, J.**                                            **June 15, 2009**

This action was initiated by Jorge Martinez, who has brought claims for negligence, strict liability, breach of the implied warranties of merchantability and fitness for a particular purpose, and gross negligence against Defendant Skirmish, U.S.A., Inc. ("Skirmish"), arising from the injury he suffered when he was hit in the eye with a paintball at Skirmish's Jim Thorpe, Pennsylvania facility on March 19, 2006.  Before the Court is Skirmish's Motion for Summary Judgment.  For the reasons that follow, the Motion is granted in part and denied in part.

## I.      FACTUAL BACKGROUND

On March 19, 2006, Martinez played paintball at Skirmish's facility in Jim Thorpe, Pennsylvania, as part of a group that had traveled to Jim Thorpe from New York.  (1st Am. Compl. ¶ 12; Skirmish Ans. ¶ 12; Martinez Dep. at 21-22.)  Paintball is an activity in which two or more teams, or separate individuals, engage in mock war games.  (1st Am. Compl. ¶ 6; Skirmish Ans. ¶ 6.)  Participants shoot their opponents with paintballs, which are gelatin encased balls of dye that are propelled from paintball guns by the use of carbon dioxide gas or compressed air.  (1st Am. Compl. ¶ 6; Skirmish Ans. ¶ 6.)

Skirmish sells and rents paintball equipment to participants who do not have their own, including paintball guns, goggles and paintballs,.  (Martinez Dep. at 35, 43, 45-46; Lukasevich Dep.

at 13, 17; Crespo Dep. at 46.)  Martinez did not own his own paintball equipment.  (Martinez Dep. at 23.)  Consequently, when Martinez arrived at Skirmish's Jim Thorpe paintball facility, he rented a paintball gun, paintball goggles and a camouflage suit and purchased paintballs from Skirmish. (Id. at 30, 35, 43-46; Pl. Product Liability Identification ¶ 1.)  While he was in the building renting equipment and purchasing paintballs, Martinez signed a Waiver & Release (Skirmish Ex. N) that his friends told him he had to sign in order to play.  (Martinez Dep. at 47-48.)  Martinez's English was not very good in 2006 and he was not able understand more than a few words of the Waiver & Release.  (Id. at 48-49.)  He did, however, fill out name and address information and sign and dated the Waiver & Release with the assistance of his friends.   (Id. at 50-51.)  He did not, however, ask any of his friends or any Skirmish employees to interpret the entire document for him.  (Id. at 49.)  Signed Waivers & Releases were collected from the players in Martinez's group before they got on a bus that took them from the rental building to the field where they would play paintball.  (Id. at 55.)  A referee provided by Skirmish rode the bus with Martinez's group and reviewed the rules of play.  (Id. at 55-56.)  Martinez does not presently remember any of those rules, but he does remember that he was not supposed to take his goggles off during paintball games.  (Id. at 56-64, 68-69.)

The pair of goggles that Martinez rented from Skirmish on March 19, 2006 were returned to Skirmish's general inventory after his injury and have not been located.  (Fink Dep. at 19.)  Martinez has, however, identified the goggles he rented from Skirmish on March 19, 2006 as VForce Armor Rental Field Black Goggles.  (Pl. Product Liability Identification ¶ 1.)  The word "VForce" was printed on the top of the goggles.  (Martinez Dep. at 45.)  Those were the only kind of goggles that Skirmish rented at the time of Martinez's injury.  (Paul Fogel Dep. at 49-50.)

Martinez reports that the goggles he rented from Skirmish appeared to be old and were not

2

in very good condition.  (Martinez Dep. at 198-99.)  When Martinez put the goggles on before his first game, they did not fit tightly, and they became foggy while he was playing.  (Id. at 60-61, 69.) No one from Skirmish showed the players how to tighten the goggles and Martinez's goggles were loose for all five of the games that he played on March 19, 2006.  (Id. at 69,  113.)  He continued to play even though his goggles were loose and he believed that they should have fit more tightly.  (Id. at 113-15.)  He tried to inform a referee that his goggles were loose during the second game, but the referee just waved him back to the game and did not listen to his concerns.  (Id. at 115-16.)

During the fifth game Martinez played on March 19, 2006, Martinez's group was divided into two teams for a capture-the-flag game.  (Id. at 175, 180-81.)  Martinez was running across the playing field, trying to capture the other team's flag, when his goggles slipped down his face until the top of the goggles rested on the tip of his nose, thereby leaving his eyes unprotected.  (Id. at 119, 180, 183, 187.)  He was shot in the right eye with a paintball immediately after his goggles slipped. (Id. at 183-84, 187.)  Martinez was permanently blinded in his right eye.  (Id. at 145-47.)

Martinez's expert, Dr. Allen M. Bissell of Trident Engineering Associates, Inc. ("Trident"), has opined that the VForce Armor Rental Field Black Goggles rented to Martinez by Skirmish were defectively designed in that they did not contain a vertical restraint that would prevent them from moving vertically on the wearer's face.  (12/8/08 Trident Rpt. at 7 ¶ f.)  The design thus allowed the goggles to slip during circumstances common to paintball, such as "sweating, brushing against trees and . . . branches, running, and stumbling."  (Id.)  Dr. Bissell further opined that the "rear strap on the VForce armor [goggles] rented to Mr. Martinez was defectively designed, in that it will loosen during circumstances that are commonly predictable . . . [in paintball activities] . . . leading to mask slippage, which exposes the wearer's eyes to being struck by paintballs shot at ballistic speeds."  (Id.

at 8 ¶ g.)  Dr. Bissell has also reported that "a fogged lens is evidence of a poorly fitted mask, such as one where the head strap cannot be adjusted to hold the facemask in place."  (Id. at 4.)  He has concluded that the fact that Martinez's goggles became foggy "is evidence that the mask was not seating properly and was unacceptably loose on [his] face."  (Id. at 7 ¶ b.)  Dr. Bissell has also opined that the goggles Skirmish rented to Martinez were defectively maintained in that the rear strap was old and worn at the time it was used by Martinez, leading to slippage.  (Id. at 7 ¶ e.)  Finally, Dr. Bissell has opined that alternative goggle designs that would have cured the vertical restraint defects of the VForce Armor Rental Field Black Goggles existed, and were being manufactured and sold, at the time of Martinez's injury.  (Id. at 8 ¶ j.)  Skirmish purchased goggles using these alternative design goggles prior to Martinez's injury.  (Pl. Ex. H.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court --

that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response "must -- by affidavits or otherwise as provided in this rule -- set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322. "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact."  Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000) (citations omitted).  Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial.  See Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993).

## III.    DISCUSSION

Skirmish argues that it is entitled to summary judgment on all of Martinez's claims because he signed the Waiver & Release.  Skirmish also argues that it is entitled to summary judgment on Martinez's claims for negligence and gross negligence because it did not owe a duty to Martinez, who knowingly engaged in an obvious risk while playing paintball, and because he assumed the risk of injury while playing paintball.  Skirmish also contends that it is entitled to summary judgment on Plaintiff's strict liability claims because the goggles Martinez used were not unreasonably dangerous. Finally, Skirmish argues that it was not the proximate cause of Martinez's injuries.

A.    The Waiver & Release

On March 19, 2006, before he began playing paintball, Martinez signed a Waiver & Release

of Liability.  The Waiver & Release states that it "must be read & signed before the participant is

allowed to take part in any paintball event."  (Skirmish Ex. N.)  The Waiver & Release further

provides as follows:

> IN CONSIDERATION of SKIRMISH, U.S.A., Inc. furnishing services and/or equipment to enable me to participate in paintball games, I agree as follows:
>
> I fully understand and acknowledge that; (a) risks and dangers exist in my use of Paintball equipment and my participation in Paintball activities, (b) my participation in such activities and/or use of such equipment may result in my illness including but not limited to bodily injury, disease strains, fractures, partial and/or total paralysis, eye injury, blindness, heat stroke, heart attack, death or other ailments that could cause serious disability; (c) these risks and dangers may be caused by the negligence of the owners, employees, officers or agents of SKIRMISH U.S.A.; the negligence of the participants, the negligence of others, accidents, breeches [sic] of contract, the forces of nature or other causes.  These risks and dangers may arise from foreseeable or unforeseeable causes, and (d) by my participation in these activities and/or use of equipment, I hereby assume all risks and dangers and all responsibility for any losses and/or damages, whether caused in whole or in part by the negligence or other conduct of the owners, agents, officers, employees of SKIRMISH U.S.A., or by any other person.
>
> I, on behalf of myself, my personal representatives and my heirs, hereby voluntarily agree to release, waive, discharge, hold harmless, defend and indemnify its owners, agents, officers and employees from any and all claims, actions or losses for bodily injury, property damage, wrongful death, loss of services or otherwise which may arise out of my use of Paintball equipment or my participation in Paintball activities, I specifically understand that I am releasing, discharging and waiving any claims or actions that I may have presently or in the future for the negligent acts or other conduct by the owners, agents, officers or employees of SKIRMISH U.S.A.  Said release shall further assign to SKIRMISH U.S.A. all right to use photographs of me taken relative to playing the game.
>
> **I HAVE READ THE ABOVE WAIVER AND RELEASE AND BY SIGNING IT AGREE IT IS MY INTENTION TO EXEMPT**

**AND RELIEVE SKIRMISH U.S.A. FROM LIABILITY FOR PERSONAL INJURY, PROPERTY DAMAGES OR WRONGFUL DEATH CAUSED BY NEGLIGENCE OR ANY OTHER CAUSE.**

(Skirmish Ex. N.)

Skirmish argues that the Waiver & Release is valid and enforceable.  As we have diversity jurisdiction over this case, "we must apply Pennsylvania's law to the facts of this case."  Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 46 n.11 (3d Cir. 2009) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).  In Pennsylvania, exculpatory contracts, such as the Waiver & Release in this case, "are not favorites of the law and will be construed strictly."  Valeo v. Pocono Int'l Raceway, Inc., 500 A.2d 492, 493 (Pa. Super. Ct.1985) (citing Employers Liab. Assurance Corp. v. Greenville Bus. Men's Ass'n, 224 A.2d 620, 623 (Pa. 1966)).  Exculpatory contracts are, however, valid and enforceable if the following conditions are met:

> The contract must not contravene any policy of the law. It must be a contract between individuals relating to their private affairs. Each party must be a free bargaining agent, not simply one drawn into an adhesion contract, with no recourse but to reject the entire transaction. . . . However, to be enforceable, several additional standards must be met. First, we must construe the agreement strictly and against the party asserting it. Finally, the agreement must spell out the intent of the parties with the utmost particularity.

Zimmer v. Mitchell & Ness, 385 A.2d 437, 439 (Pa. Super. Ct. 1978) (en banc), aff'd, 416 A.2d 1010 (Pa. 1980) (per curiam) (citing Employers Liab., 224 A.2d at 620).   We are required to "use common sense in interpreting this agreement."  Id.

      1.    Public policy/regulation of private affairs

An exculpatory contract does not contravene public policy "'if it is not a matter of interest to the public or State.'"  Leidy v. Deseret Enters. Inc., 381 A.2d 164, 167 (Pa. Super. Ct. 1977)

7

(quoting <u>Dilks v. Flohr Chevrolet</u>, 192 A.2d 682, 687 (Pa. 1963)).  "[M]atters of interest to the public or the state include the employer-employee relationship, public service, public utilities, common carriers, and hospitals."  <u>Seaton v. E. Windsor Speedway, Inc.</u>, 582 A.2d 1380, 1382-83 (Pa. Super. Ct. 1990) (citing <u>Leidy</u>, 381 A.2d at 167).  We find that the Waiver & Release in this case, which pertains solely to Martinez's voluntary participation in recreational activity, does not contravene public policy as it is "'a contract between individuals pertaining to their private affairs and does not impair generally the rights of members of the public.'"  <u>Id.</u> (quoting <u>Valeo</u>, 500 A.2d 492).

2. <u>The parties' relative bargaining power</u>

Martinez argues that the Waiver & Release should not be enforced against him because he was not a free bargaining agent.  He contends that he was unable to read the Waiver & Release prior to signing it and did not understand its contents.   He also argues that the Waiver & Release is an unenforceable contract of adhesion.

It is the law in Pennsylvania that failure to read a contract is not an excuse and does not nullify a contract.  <u>See</u> <u>Standard Venetian Blind Co. v. Amer. Empire Ins. Co.</u>, 469 A.2d 563, 566 (Pa. 1983) ("'[I]n the absence of proof of fraud, failure to read [the contract] is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof.'" (quoting <u>In re Olson's Estate</u>, 291 A.2d 95, 98 (Pa. 1972))).  <u>See also</u>  <u>T. W. Phillips Gas & Oil Co. v. Kline</u>, 84 A.2d 301, 302 (Pa. 1951) ("Where there is no allegation *and proof* of fraud or where there is no legal justification for failure to read a written contract on which suit is brought, failure to read is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof[.]" (citing <u>Berardini v. Kay</u>, 192

8

A. 882 (Pa. 1937), Schoble v. Schoble, 37 A.2d 604 (Pa. 1944) and Silberman v. Crane, 44 A.2d 598 (Pa. Super. Ct. 1945))).  Moreover, an otherwise enforceable release will be enforced even if the signor did not know that it was a release when he signed it. In Seaton, the Superior Court affirmed an order granting summary judgment against Seaton and in favor of the owner of the racetrack where Seaton was injured, because Seaton had signed an agreement releasing all claims against the racetrack.  The Superior Court determined that the release signed by Seaton was enforceable, even though Seaton claimed that he had not read it, did not know he was signing a release, and did not have time to read the document.  Seaton, 582 A.2d at 1383 (internal quotations omitted). ("Appellant . . . argues that, due to the long line of people behind him, he did not have time to read the Release. 'His explanation that he did not read it does not, in the absence of fraud or a confidential relationship, extricate him from its operation.'" (quoting Talbert v. Lincoln Speedway, 33 Pa. D.&C. 3d 111, 114 (C.P. Adams Co. 1984))).

The fact that Martinez could not have read and understood the written release also does not affect its enforceability.  In Arce v. U-Pull-It Auto Parts, Inc., Civ. A. No. 06-5593, 2008 WL 375159 (E.D. Pa. Feb. 11, 2008), the court found enforceable the terms of a release signed by Arce when he entered the U-Pull-It Auto Parts junkyard, waiving his negligence claims against the junkyard, where he was injured when a car collapsed on him, even though Arce spoke and read only Spanish and could not read the release.  Id. at *7 ("Plaintiff's alternative argument -- that the release cannot be enforced against him since he does not speak or read English -- is also unavailing."). Under Pennsylvania law, "'[a] person of age is presumed to know the meaning of words in a contract, and if, relying upon his own ability, he enters into an agreement not to his best interests he cannot later be heard to complain that he was not acquainted with its contents and did not understand

9

the meaning of the words used in the instrument which he signed.'" Id. (quoting Schoble v. Schoble,

37 A.2d 604, 605 (Pa. 1944)).  The Arce court found that the release was enforcable against Arce,

even though he could not read it himself, and that the junkyard had no obligation to ensure that Arce

could read the release:

> **In this case, Plaintiff cannot claim ignorance to avoid the ramifications of his signed release. Although Plaintiff could not read the release himself, he could have either asked Pedro Rosado, who read both English and Spanish, to translate the writing on the sheet or inquired as to whether a Spanish-speaking employee of the junkyard was available to explain the document. Nonetheless, he admitted that he exercised neither option**. (Arce Dep. 49:7-20, 55:8-13.)  Rosado's misrepresentation that the release was nothing more than a sign-in sheet likewise does not act to nullify the contractual relationship. See Seaton v. East Windsor Speedway, Inc., 400 Pa. Super. 134, 582 A.2d 1380, 1383 (Pa. Super Ct. 1990) ("[A] releasor can ordinarily not avoid the effect of a release upon the ground that at the time he signed the paper he did not read it or know its contents, but relied on what another said about it." (quoting 66 Am. Jur. 2d Release § 15 (1973))).  **Nor did Defendant have an obligation to verify that Plaintiff had read and fully understood the terms of the document before he signed his name to it.** [Schillachi v. Flying Dutchman Motorcycle Club, 751 F. Supp. 1169, 1175 (E.D. Pa. 1990)] (imposing a duty to inform effectively would abrogate Pennsylvania's legal duty to read).

Id. at *8 (footnote omitted) (emphasis added).  See also Morales v. Sun Constructors, Inc., 541 F.3d

218, 222 (3d Cir. 2008) (holding that Morales was bound by the arbitration clause in his employment

contract, even though he knew only Spanish and the contract was written in English, because, "[i]n

the absence of fraud, the fact that an offeree cannot read, write, speak, or understand the English

language is immaterial to whether an English-language agreement the offeree executes is

enforceable").

    We find that Martinez, like Arce, was accompanied to Skirmish by friends who were able

10

to read and understand English and who could have explained the Waiver & Release to him, if he had asked them to do so.  He did not.  There is no evidence of fraud in connection with Martinez's execution of the Wavier & Release in this case.  Consequently, Martinez's failure to read that document cannot constitute a defense to the enforceability of the Waiver & Release.  See Standard Venetian Blind Co., 469 A.2d at 566.

Martinez also argues that the Waiver & Release he signed is an unenforceable contract of adhesion because he had no choice but to sign it, since he had pre-paid for the paintball activity and had ridden a bus from New York for the experience.  He is wrong.  He signed the Waiver & Release so that he could voluntarily participate in a recreational activity.  An agreement in which each party is free to participate, or not participate, is not a contract of adhesion under Pennsylvania law.  Valeo, 500 A.2d at 493 (finding that exculpatory agreement between racecar driver and racetrack owner was not a contract of adhesion because "[e]ach party is free to participate or not to participate; a race driver is under no compulsion, economic or otherwise, to engage in automobile racing . . .").  See also Kotovsky v. Ski Liberty Operating Corp., 603 A.2d 663, 665 (Pa. Super. Ct. 1992) ("The agreement in the instant case was not one of adhesion. Appellant was not required to enter the contract, but did so voluntarily in order to participate in a downhill ski race. This activity was not essential to appellant's personal or economic well-being; it was purely a recreational activity." (citing Valeo, 500 A.2d 492)); Mandell v. Ski Shawnee, Inc., Civ. A. No. 3:05-1503, 2007 WL 121847, at *2 (M.D. Pa. Jan. 11, 2007) (determining that a ski resort's form release was not "a contract of adhesion as each party is free to participate or to choose not to[,] that is, the plaintiff was under no compulsion, economic or otherwise to engage in snowtubing" (citing Valeo, 500 A.2d at 493)); Nicholson v. Mount Airy Lodge, Inc., Civ. A. No. 96-5381, 1997 WL 805185, at *3 (E.D. Pa.

11

Dec. 29, 1997) ("Because plaintiff decided to roller skate as a recreational activity while on vacation and there is no evidence that he was under any compulsion to do so, he cannot complain that he was in an unfair bargaining position when he signed the exculpatory agreement."  (citing Schillachi v. Flying Dutchman Motorcycle Club, 751 F. Supp. 1169, 1172-73 (E.D. Pa. 1990))) .

Martinez also argues that the Waiver & Release is an unenforceable contract of adhesion because it does not specifically define the rights he released.  He relies on Chepkevich v. Hidden Valley Resort, L.P., 911 A.2d 946 (Pa. Super. Ct. 2006), appeal granted, 931 A.2d 630 (Pa. 2007). Chepkevich sued the Resort in negligence for injuries she suffered after she fell off a chairlift.  The Resort moved for summary judgment based on a release signed by Chepkevich, which she claimed not to have read.  Id. at 948.  The release stated the following:  "By accepting this Season Pass I agree to accept all these risks and agree not to sue [Appellee] or their employees if injured while using their facilities regardless of any negligence on their part."  Id. at 951.  The Superior Court concluded that this Release may have been a contract of adhesion because the term "negligence" was not defined:  "the legal term 'negligence' is not clearly defined or illustrated in any way, such as with an example of conduct that can be considered negligent.  As such, [the] Release from Liability arguably amounts to an adhesion contract which provides no recourse to one who disagrees with it but to reject the entire transaction."  Id. at 951-52 (footnote omitted).  The Superior Court did not, however, decide the case based on this conclusion, but vacated the trial court's order granting summary judgment to the Resort based on evidence that Chepkevich had entered into a separate contract with the chair lift operator in which he agreed to stop the lift for her, and her young nephew, so that they could safely board the lift.  Id. at 952.

The Pennsylvania Supreme Court has granted an appeal Chepkevich to determine, among

other issues, whether an exculpatory contract must specifically define "negligence" and whether Chepkevich conflicts with the opinion of the Superior Court in Nissley v. Candytown Motorcycle Club, 913 A.2d 887 (Pa. Super. Ct. 2006). Chepkevich, 931 A.2d at 630.

Nissley also concerned the enforceability of an exculpatory contract. Nissley sued the Candytown Motorcycle club for negligence in connection with injuries he suffered when he rode his motorcycle over a jump on a track on the Club's property and collided with a tractor hidden behind the jump. Nissley, 913 A.2d 888. The trial court granted summary judgment in favor of the motorcycle club based upon a release signed by Nissley. Id. The Superior Court affirmed, finding that the following language unambiguously waived Nissley's right to bring a negligence claim against the motorcycle club: "I give up all my rights to sue or make claim against the CANDYTOWN MOTORCYCLE CLUB, INC. . . . for any injury to property or person I may suffer, including crippling injury or death . . . I know the risks of danger to myself and my property while upon the club property and . . . assume all such risks of loss . . . ." "Nissley, 913 A.2d at 890-91. The Superior Court rejected Nissley's argument that the release was ambiguous, concluding that "[t]he exculpatory clause explicitly states that the signer is giving up all rights to sue. Thus, a reasonable person would have understood, from the very beginning, that he was waiving all rights to bring a claim, without qualification." Id. at 891.

Since the Supreme Court has not yet resolved the different approaches taken in Chepkevich and Nissley, we must predict whether it would find that a release is an unenforceable contract of adhesion because it fails to specifically define the term "negligence." See Berrier, 563 F.3d at 45-46 ("In the absence of a controlling decision by the Pennsylvania Supreme Court, a federal court applying that state's substantive law must predict how Pennsylvania's highest court would decide

this case." (citing <u>Nationwide Mutual Ins. Co. v. Buffetta</u>, 230 F.3d 634, 637 (3d Cir. 2000)) (footnote omitted)).  In conducting our analysis, we consider "'relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" <u>Nationwide</u>, 230 F.3d at 637 (quoting <u>McKenna v. Ortho Pharm. Corp.</u>, 622 F.2d 657, 663 (3d Cir. 1980)).

In <u>Chepkevich</u>, the Superior Court did not cite any authority for its statement that the release in that case "arguably amounts to an adhesion contract which provides no recourse to one who disagrees with it but to reject the entire transaction" because "the legal term 'negligence' is not clearly defined or illustrated in any way, such as with an example of conduct that can be considered negligent." <u>Chepkevich</u>, 911 A.2d at 951-52 (footnote omitted).  The Superior Court has found exculpatory clauses in other cases to be valid even if they did not specifically define negligence or illustrate that term with examples.  <u>See, e.g.</u>, <u>Zimmer</u>, 385 A.2d at 439 (finding that exculpatory clause in ski equipment rental agreement which stated that the renter "accepts 'full responsibility for any and all . . . damage or injury' resulting from use of the equipment" waived claims for negligence, because "[a]lthough we must construe the contract strictly, we must also use common sense in interpreting this agreement"); <u>see also</u> <u>Nissley</u>, 913 A.2d at 890-91 (finding that the phrase "I hereby give up all my rights to sue or make claim against the CANDYTOWN MOTORCYCLE CLUB, INC." established a "clear intention to release all claims for injuries sustained while participating in the relevant activity" including Nissley's negligence claim against the motorcycle club).

The year after its <u>Chepkevich</u> decision, the Superior Court again addressed the enforceability of an exculpatory contract that released negligence without defining or illustrating that term.  <u>See</u> <u>Wang v. Whitetail Mountain Resort</u>, 933 A.2d 110 (Pa. Super. Ct. 2007).  Wang was injured while

14

snowtubing at the Whitetail resort when an employee negligently instructed her to exit her snowtube in the path of an oncoming snowtube.  Id. at 111.  Wang had signed a release at the resort, in which she agreed to release the resort from "**ANY AND ALL LIABILITY RELATED TO INJURY, PROPERTY LOSS OR OTHERWISE RELATED TO MY USE OF THE TUBING FACILITY, REGARDLESS OF ANY NEGLIGENCE ON THE PART OF WHITETAIL**."  Id. at 112 (internal quotation omitted).  The trial court dismissed Wang's complaint based upon this release.  Id.  Wang appealed, based on Chepkevich, and asked the Superior Court to determine whether the release precluded a claim by the signer of the release "for injuries caused by the negligent actions of [Whitetail's] employee in directing the signer to move into the path of another snow tuber where the wording of the release does not establish that that type of negligent conduct was within the contemplation of the parties at the time of signing[.]"  Id.  The Superior Court rejected Wang's argument that Chepkevich governed her claim, and based its decision to affirm the trial court on the relative prominence of the exculpatory language in Wang's release, rather than on the lack of definition of the term "negligence."  The Superior Court found that, because the language at issue in Wang's release was set apart prominently in a separately titled paragraph, was in a larger font than other portions of the document, and was printed in bold capital letters, it was "enforceable as it operates as a particularized expression of appellant's intention to assume the risk of activities 'related to' snow tubing at Whitetail Mountain."  Id. at 113.  The Superior Court distinguished the release in Wang from the release in Chepkevich by explaining that the release in Chepkevich "was 'printed in the same, relatively small font as the remaining text and . . . [was] located in the final sentence of the first paragraph . . . .'"  Id. (quoting Chepkevich, 911 A.2d at 951).

As we have discussed above, the Superior Court cited no authority for its statement in

Chepkevich that Hidden Valley Resort's form release might be a contract of adhesion because that document did not define the word "negligence" or give meaning to that word with illustrations.  We have identified relevant state precedents and analogous decisions by the Superior Court enforcing exculpatory contracts that released claims for negligence even though those contracts did not define or illustrate the term.  We have not, however, identified any authority in Pennsylvania that explicitly holds that an exculpatory contract that purports to release claims for negligence is an unenforceable contract of adhesion because it does not define or illustrate the meaning of the word "negligence." We predict, accordingly, that the Pennsylvania Supreme Court, in its consideration of the defendant's appeal in Chepkevich, will conclude that negligence need not be specifically defined and illustrated with examples in an exculpatory contract.  See  Chepkevich, 931 A.2d at 630.

We therefore conclude that the Wavier & Release was not a contract of adhesion under Pennsylvania law.  As we have also determined that the Waiver & Release was a contract relating to the private affairs of Skirmish and Martinez, and that Martinez was a free bargaining agent, we further conclude that the Waiver & Release is valid and enforceable against Martinez.  See Zimmer, 385 A.2d at 439.  Consequently, we must also determine which of Martinez's claims are waived and released by that exculpatory contract.

3.    Scope of the Waiver & Release

Skirmish argues that the Waiver & Release waives all claims against it, including Martinez's strict liability, gross negligence and warranty claims, because it waives "any and all claims, actions or losses for bodily injury . . . ."  (Skirmish Ex. N.)  We disagree.  Exculpatory contracts are construed strictly and against the party asserting them and must "spell out the intent of the parties with the utmost particularity." Zimmer, 385 A.2d at 439.  The Waiver & Release in this case clearly

states that the signor assumes "all risks and dangers and all responsibility for any losses and/or damages, whether caused in whole or in part by the negligence or other conduct of the owners, agents, officers, employees of SKIRMISH U.S.A., or by any other person." (Skirmish Ex. N.)  The Waiver further states that the signor agrees to release Skirmish from "any and all claims, actions or losses for bodily injury . . .[;]" that the signor "specifically understand[s] that I am releasing, discharging and waiving any claims or actions that I may have presently or in the future for the negligent acts or other conduct by the owners, agents, officers or employees of SKIRMISH, U.S.A. . . .[;]" and that the signor intends to **EXEMPT AND RELIEVE SKIRMISH U.S.A. FROM LIABILITY FOR PERSONAL INJURY . . . CAUSED BY NEGLIGENCE OR ANY OTHER CAUSE**.  (Id.)

The Superior Court recently examined a release that contained similar specific and general exculpatory language and concluded that it released only negligent conduct.  See Tayar v. Camelback Ski Corp., 957 A.2d 281, 287 (Pa. Super. Ct. 2008).  Tayar was injured when she was hit by a snow tube when a Camelback employee, who did not check to make sure her chute was clear, sent a second snow tube down the chute before she had exited the chute.  Id. at 284.  The release signed by Tayar listed many possible hazards of snow tubing, but did not specifically list employee recklessness and intentional acts by employees.  Id. at 288.  The release also contained the following language:

> IN CONSIDERATION OF THE ABOVE AND OF BEING ALLOWED TO PARTICIPATE IN THE SPORT OF SNOWTUBING, I AGREE THAT I WILL NOT SUE AND WILL RELEASE FROM ANY AND ALL LIABILITY CAMELBACK SKI CORPORATION IF I OR ANY MEMBER OF MY FAMILY IS INJURED WHILE USING ANY OF THE SNOWTUBING FACILITIES OR WHILE BEING PRESENT AT THE FACILITIES,

EVEN IF I CONTEND THAT SUCH INJURIES ARE THE RESULT OF NEGLIGENCE OR ANY OTHER IMPROPER CONDUCT ON THE PART OF THE SNOWTUBING FACILITY.

Id. at 288-89.  The Superior Court determined that, while the phrase "I AGREE THAT I WILL NOT SUE AND WILL RELEASE FROM ANY AND ALL LIABILITY CAMELBACK SKI CORPORATION IF I OR ANY MEMBER OF MY FAMILY IS INJURED" appeared to waive all claims against Camelback under any theory of liability, the meaning of that phrase was modified by the language that followed it: "EVEN IF I CONTEND THAT SUCH INJURIES ARE THE RESULT OF NEGLIGENCE OR ANY OTHER IMPROPER CONDUCT ON THE PART OF THE SNOWTUBING FACILITY."  Id. at 291-92.  The Superior Court concluded that this additional language constituted a refinement of the contract, narrowing the scope of the release to claims for negligence: "[t]his further language is important as it constitutes a refinement of the clause agreeing not to sue Camelback. It explicitly mentions only negligence, while using a vague phrase of general import, i.e., 'other improper conduct,' as a catch-all." Id. at 292. The Superior Court concluded that this exculpatory contract released Camelback from liability for its negligence and the negligence of its employees, but did not release it from liability for the reckless and intentional acts of its employees:

> As the release contains only the term of general import, "other improper conduct," it fails to explicitly and clearly convey that the releasor is surrendering the right to compensation for intentional and reckless torts committed by Camelback employees. These types of allegations clearly fall outside the typical dangers of recreational activities, as all of the examples in the release relate, and of allegations of ordinary negligence.

Id. at 292-93.

The Waiver & Release in this case, like the release in Tayar, contains language that appears

18

to release all claims against Skirmish, under any legal theory.  However, the meaning of the Waiver & Release, like the release in Tayar, is modified by its specific references to negligence.  Construing the Waiver & Release in this case strictly against Skirmish, and using common sense to interpret its restrictions, we find that an ordinary customer of Skirmish would not understand that the general language in the Waiver & Release spelled out, with utmost particularity, an intent to waive any and all claims against Skirmish under any legal theory.  Zimmer, 385 A.2d at 439.  We conclude, accordingly, that the general phrasing in the Waiver & Release, that the signor agrees to both release Skirmish from "any and all claims" and to relieve Skirmish from liability for personal injury "**CAUSED BY NEGLIGENCE OR ANY OTHER CAUSE**" (Skirmish Ex. N.), fails to "explicitly and clearly convey" that Martinez had surrendered his right to compensation for Skirmish's gross negligence, breach of implied warranty, or strict liability by executing the Waiver & Release.  Tayar, 957 A.2d at 292.

In addition, Pennsylvania law prohibits the waiver of strict liability claims by a consumer through a form release.  See Simeone v. Bombardier-Rotax GmbH, Civ. A. No. 02-4852, 2005 WL 2649312, at *3 (E.D. Pa. Oct. 12, 2005) (stating that a form release cannot waive strict product liability claims "by a consumer who is injured by a defective product" (citing Keystone Aeronautics Corp. v. R.J. Enstrom Corp., 499 F.2d 146, 149 (3d Cir. 1974) and Jankowski v. Ski Roundtop, Inc., 45 Pa. D. & C.3d 671, 675-77 (C.P. Adams Co. 1986)); see also Keystone Aeronautics, 499 F.2d at 149 (noting that Pennsylvania's adoption of Section 402A of the Restatement (Second) of Torts evinced a "social policy aimed at protecting the average consumer by prohibiting blanket immunization of a manufacturer or seller through the use of standardized disclaimers").  Furthermore, Pennsylvania law requires that waiver of the implied warranties of merchantability and

19

fitness for a particular purpose be accomplished through a writing that includes specific language that is not present in the Waiver & Release signed by Martinez in this case.  Specifically,  13 Pa. Cons. Stat. Ann. § 2A214 provides:

> Subject to subsection (c), to exclude or modify the implied warranty of merchantability or any part of it, the language must mention "merchantability," be by a writing and be conspicuous. Subject to subsection (c), to exclude or modify any implied warranty of fitness, the exclusion must be by a writing and be conspicuous. Language to exclude all implied warranties of fitness is sufficient if it is in writing, is conspicuous and states, for example, "There is no warranty that the goods will be fit for a particular purpose."

13 Pa. Cons. Stat. Ann. § 2A214(b).

We conclude, accordingly, that the Waiver & Release that Martinez signed before beginning his participation in paintball activities on March 19, 2006, is enforceable and acts as a waiver of Martinez's negligence claim.  Skirmish's Motion for Summary Judgment is, accordingly, granted as to Count One of Martinez's First Amended Civil Action Complaint against Skirmish and that Count is dismissed. We further conclude, however, that the Waiver & Release did not waive or release any of Martinez's claims for gross negligence, strict liability, or breach of the implied warranties of merchantability and fitness for a particular purpose.

B.    Gross Negligence

Count II of the First Amended Complaint asserts a claim for gross negligence.  Skirmish argues that it is entitled to summary judgment on Plaintiff's negligence claims, including gross negligence, because it owed no duty of care to Martinez, and Martinez assumed the risk of injury when he went to Skirmish to play paintball.[1]  As Martinez's claim for negligence is dismissed, we

---

[1]Assumption of the risk may also provide a defense to products liability claims, but Skirmish does not presently argue that it does so in this case.  See Barnes v. Am. Tobacco Co. Inc., 984 F.

consider only whether the no-duty rule or the doctrine of assumption of risk bar his recovery for Skirmish's alleged gross negligence in this case.

The Pennsylvania Supreme Court generally defines negligence as "the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." Martin v. Evans, 711 A.2d 458, 461 (Pa. 1998) (citing Lanni v. Pennsylvania R. Co., 371 Pa. 106, 88 A.2d 887 (1952) and Pa. SSJI (Civ) 3.01). Gross negligence is "a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." Legion Indem. Co. v. Carestate Ambulance, Inc., 152 F. Supp. 2d 707, 717 (E.D. Pa. 2001) (citing Albright v. Abington Mem'l Hosp., 696 A.2d 1159, 1164 (Pa. 1997) and Bloom v. DuBois Reg'l Med. Ctr., 597 A.2d 671, 679 (Pa. Super. Ct. 1990)). The Pennsylvania no-duty rule provides that "a defendant owes no duty of care to warn, protect, or insure against risks which are 'common, frequent and expected' and 'inherent' in an activity." Craig v. Amateur Softball Ass'n of Am., 951 A.2d 372, 375 (Pa. Super. Ct. 2008) (citing Jones v. Three Rivers Mgmt. Corp., 394 A.2d 546, 551 (Pa. 1978)). If the court determines that the no-duty rule applies "to a negligence claim, a plaintiff will be unable to set forth a *prima facie* case of liability." Id. at 375-76 (citing McCandless v. Edwards, 908 A.2d 900, 903 (Pa. Super. Ct. 2006), appeal denied 923 A.2d 1174 (Pa. 2007)).

The law in Pennsylvania is unsettled as to whether the doctrine of assumption of the risk survives as an independent defense to liability in negligence claims or whether that doctrine survives only as an aspect of the no-duty rule. In Howell v. Clyde, 620 A.2d 1107 (Pa. 1993), the

---

Supp. 842, 868 (E.D. Pa. 1997) ("The assumption of risk doctrine is applicable to both negligence and strict liability claims."). In a strict liability action, assumption of risk is a jury issue that Skirmish may raise as a defense at trial. Howell v. Clyde, 620 A.2d 1107, 1113 n.10 (Pa. 1993).

Pennsylvania Supreme Court considered whether the doctrine of assumption of risk survived after the legislature adopted the comparative negligence statute.   A plurality of the <u>Howell</u> Court concluded that, except as it was preserved by statute, or where the defense was asserted in connection with a claim of strict liability, the doctrine would survive only as part of the duty analysis conducted by the court:

> to the extent that an assumption of risk analysis is appropriate in any given case, it shall be applied by the court as a part of the duty analysis, and not as part of the case to be determined by the jury. This approach preserves the public policy behind the doctrine while at the same time alleviating the difficulty of instructing a jury on voluntariness, knowledge, and scope of the risk.

<u>Id.</u> at 1112-13 (footnote omitted).  The Pennsylvania Supreme Court has since explained that the doctrine of assumption of risk is essentially the same as the no-duty rule.  "It is precisely because the invitee assumes the risk of injury from obvious and avoidable dangers that the possessor owes the invitee no duty to take measures to alleviate those dangers. Thus, to say that the invitee assumed the risk of injury from a known and avoidable danger is simply another way of expressing the lack of any duty on the part of the possessor to protect the invitee against such dangers." <u>Hughes v. Seven Springs Farm, Inc.</u>, 762 A.2d 339, 343 (Pa. 2000) (quoting <u>Carrender v. Fitterer</u>, 469 A.2d 120, 125 (Pa. 1983)).  Under the no-duty rule, when the case involves an individual who was a spectator or participant in a sporting event or an amusement park, the issue is whether "the injury suffered resulted from a risk 'inherent' in the activity in question; if it did, then the defendant was under no duty to the plaintiff, and the suit could not go forward."  <u>Id.</u>

The Pennsylvania Supreme Court has explained the no-duty rule's limitation on liability to spectators or participants in recreational activities as follows:

> Recovery is not granted to those who voluntarily expose themselves to the kind of risks involved in . . . participating in or viewing the activity. We have therefore regularly granted or affirmed judgments n.o.v. in cases involving places of amusement where the plaintiff alleges no more than injury caused by a risk inherent in the activity in question. Only when the plaintiff introduces adequate evidence that the amusement facility in which he was injured deviated in some relevant respect from established custom will it be proper for an "inherent-risk" case to go to the jury.

Jones, 394 A.2d at 550.  The no-duty rule only applies to common, frequent and expected risks:

> "no-duty" rules, apply only to risks which are "common, frequent and expected," [Goade v. Benevolent and Protective Order of Elks, 213 Cal. 2d 183, 28 Cal. Rptr. 669 (1963)], and in no way affect the duty of theatres, amusement parks and sports facilities to protect patrons from foreseeably dangerous conditions not inherent in the amusement activity. Patrons of baseball stadiums have recovered when injured by a swinging gate while in their grandstand seats, Murray v. Pittsburgh Athletic Co., 324 Pa. 486, 188 A. 190 (1936), by tripping over a beam at the top of a grandstand stairway, Martin v. Angel City Baseball Assn., 3 Cal. App. 2d 586, 40 P.2d 287 (1935), and by falling into a hole in a walkway, under a grandstand, used to reach refreshment stands, Louisville Baseball Club v. Butler, 298 Ky. 785, 160 S.W.2d 141 (1942). In these cases, just as in the "flying baseball bat" case, Ratcliff v. San Diego Baseball Club, 27 Cal. App. 2d 733, 81 P.2d 625 (1938), the occurrence causing injury was not "a common, frequent and expected" part of the game of baseball. Therefore, there is no bar to finding the defendant negligent.

Id. at 551.  In Jones, the Pennsylvania Supreme Court determined that the no-duty rule and doctrine of assumption of risk did not foreclose the claims of a baseball spectator who was hit by a batted ball while she was standing in an interior hallway in Three River Stadium.  Id. at 551-52.

Martinez argues that the no-duty rule and doctrine of assumption of risk do not apply in this case because he did not assume the risk that he would be issued defective goggles that would slip off his face, exposing him to eye injury.  We agree.  The risk of being hit by a paintball is inherent in the activity.  Indeed, Martinez was aware of that risk and was also aware, prior to the time of his

injury, that he risked being hit in the eye with a paintball. (Martinez Dep. at 51-53, 75, 77-78, 86, 92-93.) Martinez's awareness of that risk was, however, modified by the knowledge that he was wearing protective eyewear issued to him by Skirmish. There is no evidence on the record before us that the risk that rented goggles might slip off a participant's face while that participant was running was a common, frequent and expected risk in paintball. We thus find that such a risk was not an inherent risk of the game of paintball that would bar a finding that Skirmish was grossly negligent. See Jones 394 A.2d at 551. Consequently, we conclude that the evidence of record does not establish the applicability of the no-duty rule to Martinez's gross negligence claim against Skirmish. Skirmish's Motion for Summary Judgment is, accordingly, denied as to the no-duty rule defense.[2]

Skirmish also makes the separate argument that Plaintiff's negligence claim is barred by assumption of the risk. As discussed earlier, there appears to be some question as to whether the assumption of the risk defense survives outside of strict liability (or where it has been specifically preserved by statute, as in the skiing industry). In Staub v. Toy Factory, Inc., 749 A.2d 522 (Pa. Super. Ct. 2000), the Superior Court stated that, until the Pennsylvania Supreme Court finally

---

[2]Skirmish also argues that, even if it owed a duty of care to Martinez, it is entitled to summary judgment because none of its actions were the proximate cause of Martinez's injury. Martinez contends that Skirmish rented goggles to him that were defective and, as a result of those defects, the goggles slipped off his face and failed to protect his right eye from injury when it was hit with a paintball, thus contributing to his injury. There is evidence on the record of this Motion that Skirmish rented goggles to Martinez, that those goggles had a design defect, and that the goggles slipped off his face immediately before he was hit in the right eye with a paintball. (Martinez Dep. at 44-45, 119-22, 180, 185, 198-202; 12/8/08 Trident Rpt. at 7 ¶ b, e, f, 8 ¶ g.) Viewing the evidence in the light most favorable to Martinez as the non-moving party, we find that there is a genuine issue of material fact as to whether Skirmish's actions in renting the VForce Armor Rental Field Black Goggles to Martinez was a proximate cause of his injury. Skirmish's Motion for Summary Judgment is, accordingly, denied as to this argument.

decides the matter with a majority opinion, the Pennsylvania courts should follow the plurality

opinion in Howell and consider the question of assumption of risk solely as part of the duty analysis.

Id. at 526 (footnotes omitted).  On the other hand, in Bullman v. Giuntoli, 761 A.2d 566 (Pa. Super.

Ct. 2000), decided six months after Staub, the Superior Court concluded that the doctrine survives

in negligence cases:  "as the doctrine has not been formally abolished by our Supreme Court, we are

obligated to apply the doctrine despite its less than wholehearted support."  Id. at 570.  Since the

Pennsylvania Supreme Court has not yet definitively stated whether the doctrine of assumption of

risk survives as an independent defense to liability, and as we are unable to predict what it would do

based on the conflicting decisions of the Superior Court, we have examined whether this doctrine

would bar Martinez's claim for gross negligence in this case.

      In Bullman, the Superior Court explained the doctrine of assumption of the risk as follows:

> The essence of assumption of the risk defense is not an evaluation of
> fault or negligence in encountering a danger but an acknowledgment
> that the plaintiff changed his position. Before suffering injury he
> intelligently acquiesced in a known danger and abandoned his right
> to complain, but afterwards, seeks to assert the claim he had waived
> . . . . [A] plaintiff will not be precluded from recovering except where
> it is beyond question that he voluntarily and knowingly proceeded in
> the face of an obvious and dangerous condition and thereby must be
> viewed as relieving the defendant of responsibility for his injuries.

Id. (internal quotations and citations omitted).  The Superior Court explained the factors that should

be analyzed in deciding whether to grant summary judgment based on assumption of the risk as

follows:

> it should be clear that to grant summary judgment on the basis of
> assumption of the risk it must first be concluded, as a matter of law,
> that the party consciously appreciated the risk that attended a certain
> endeavor, assumed the risk of injury by engaging in the endeavor
> despite the appreciation of the risk involved, and that the injury

> sustained was, in fact, the same risk of injury that was appreciated
> and assumed. This last factor, although certainly a logical component
> of the assumption of the risk doctrine, also appears to be a stumbling
> block in assumption of the risk analysis. Even if it is assumed that
> there is an assumption of the risk component to one's actions, it does
> not necessarily follow that any type of injury suffered in that endeavor
> becomes immune from suit. Logically speaking, the injury sustained
> must be the result of the same risk appreciated and assumed.

Id. at 573.

There is evidence on the record of this Motion that Martinez believed that his goggles were loose throughout his participation in paintball activity on March 19, 2006. (Martinez Dep. at 69-71.) There is, however, no evidence that Martinez consciously appreciated the risk that his goggles would slip off and fail to protect his eyes. Indeed, there is evidence that Martinez was hit between the eyes with a paintball while wearing the same pair of goggles and that the goggles stayed on and protected his face in that instance. (Id. at 75, 77-78.) Examining the evidence in the light most favorable to Martinez as the non-moving party, we find that genuine issues of fact remain as to whether Martinez consciously appreciated the risk that his goggles would slip off his face and expose his eyes to fast-moving paintballs. As the evidence of record does not establish that "the injury sustained was, in fact, the same risk of injury that was appreciated and assumed[,]" we cannot grant Skirmish's Motion for Summary Judgment on Martinez's claim for gross negligence based on the doctrine of assumption of risk. Bullman, 761 A.2d at 573.

Skirmish also seeks the entry of summary judgment in its favor on Martinez's gross negligence claim on the ground that there is no evidence on the record of this Motion that would support a gross negligence claim. "Generally the issue of whether a given set of facts satisfies the definition of gross negligence is a question of fact to be determined by a jury." Nicholson, 1997 WL

805185, at *4 (internal quotation omitted).  Martinez has submitted evidence that Skirmish rented goggles to him that were old and worn and fit loosely on his face; that no one from Skirmish showed him how to tighten the goggles; that a Skirmish employee waved Martinez away when he tried to ask for help with his loose goggles; and that Skirmish had purchased goggles that would eliminate the vertical restraint defects of the VForce Armor Rental Field Black Goggles rented to Martinez, but did not offer those alternative goggles for rental.  (Martinez Dep. at 69, 115-16, 198-99; Pl. Ex. H.)  We conclude that this evidence creates a genuine issue of material fact for the jury as to whether Skirmish's behavior grossly deviated from the ordinary standard of care.  Legion Idem., 152 F. Supp. 2d at 717.  Skirmish's Motion for Summary Judgment is, therefore, denied as to Martinez's claim for gross negligence.[3]

    C.    Strict Liability

Count III of the First Amended Complaint asserts a claim for strict liability against Skirmish arising from Martinez's rental of the VForce Armor Rental Field Black Goggles.[4]  Martinez contends

---

[3]Skirmish also seeks the entry of summary judgment in its favor on Martinez's request for punitive damages, on the ground that there is no evidence that would support such damages.  As we have found that there are genuine issues of material fact as to Martinez's claim for gross negligence, we also find that there are genuine issues of material fact as to whether the facts of this case could support an award of punitive damages.  Skirmish's Motion for Summary Judgment is, accordingly, denied as to this argument.

[4]The First Amended Complaint also asserts strict liability and breach of implied warranty claims against Skirmish relating to the paintball gun and paintball used to shoot Martinez in his right eye on March 19, 2006.  (1st Am. Compl. Counts III, IV.)  Martinez's strict liability and breach of implied warranty claims regarding the paintball gun were dismissed on May 21, 2009 because Martinez could not identify the paintball gun used to shoot him or its manufacturer.  (5/21/09 Mem. at 8-10, 14; 5/21/09 Order ¶ 4, 5.)  Martinez has not submitted any evidence with respect to any alleged defect in the paintball that struck him in the right eye on March 19, 2006.  Skirmish's Motion for Summary Judgment is, accordingly, granted as to Martinez's claims for strict liability and breach of implied warranty relating to the paintball that struck him in the right eye on March 19, 2006.

27

that Skirmish is strictly liable to him because the goggles it rented to him were defectively designed. The United States Court of Appeals for the Third Circuit has recently predicted that Pennsylvania will adopt Sections 1 and 2 of the Restatement (Third) of Torts relating to products liability. Berrier, 563 F.3d at 40 (footnote omitted). Section 1 of the Restatement (Third) of Torts states that: "One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect." Restatement (Third) of Torts: Products Liability, § 1. Section 2 states as follows:

> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product . . .
>
> is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe. . . .

Id. § 2(b).

Martinez claims that, but for the defective design of the VForce Armor Rental Field Black Goggles provided by Skirmish, the goggles would not have slipped below his eyes, exposing his right eye to paintball fire. "'Well-settled law in this Commonwealth provides that a manufacturer or seller will be held strictly liable if a defect in its product causes injuries to a user. A product is defective if it is unsafe for its intended use.'" Daddona v. Thind, 891 A.2d 786, 796 (Pa. Commw. Ct. 2006) (quoting Hadar v. AVCO Corp., 886 A.2d 225, 228 (Pa. Super. Ct. 2005)). In order to prevail on a strict liability claim, a plaintiff must prove that "the product is defective; the defect existed when it left the defendant's hands; and, the defect caused the plaintiff's injury." Id. (citing Hadar, 886 A.2d at 228 and Restatement (Second) of Torts § 402A (1965)). The Commonwealth

28

Court has explained that, "[t]he threshold inquiry in all products liability cases is whether there is a defect." Id. (citing Dep't of Gen. Servs. v. U. S. Mineral Prods. Co., 809 A.2d 1000 (Pa. Commw. Ct. 2002)).

Martinez asserts that the VForce Armor Rental Field Black Goggles he rented from Skirmish were defectively designed for two reasons.  First, they did not provide vertical restraint, which would have prevented the goggles from slipping down his face during paintball activities such as running, stumbling, sweating and brushing against bushes and trees.  (12/8/08 Trident Rpt. at 7.)  Martinez contends that this design is at odds with the ASTM International's Standard Specification for Eye Protective Devices for Paintball Sports, which provides that the headband or strap should rest on the wearer's ears.   (Pl. Ex. J at 5.)  He maintains that the goggles in this case did not comply with that requirement because the strap lies outside the cover at the wearer's ears and, consequently, could not rest on the wearer's ears for vertical support.  (5/29/09 Trident Rpt. at 3-4.)  He also asserts that the goggles were defectively designed because the strap would loosen under normal use for paintball activities.  Dr. Bissell opined that:

> The rear strap on the VForce Armor facemask rented to Mr. Martinez was defectively designed, in that it will loosen during circumstances that are commonly predictable, and are, in fact, expected, such as sweating, brushing against tree branches, running and stumbling.  The loosening of the rear strap causes loss of face seal, leading to mask slippage, which exposes the wearer's eyes to being struck by paintballs shot at ballistic speeds.   Such conditions render the facemask defective and unreasonably dangerous.

 (12/8/08 Trident Rpt. at 8 ¶ g.)

Skirmish contends that it is entitled to summary judgment as to Martinez's strict liability claim because the VForce Armor Rental Field Black Goggles it rented to Martinez were not

unreasonably dangerous.[5]   In Azzarello v. Black Bros. Co., 391 A.2d 1020 (Pa. 1978), the

Pennsylvania Supreme Court held that, before a design defect case can go to the jury, the court must

determine whether the product is "unreasonably dangerous."   Id. at 1026.   The Azzarello Court

explained that:

> the phrases "defective condition" and "unreasonably dangerous" as
> used in the Restatement formulation are terms of art invoked when
> Strict liability is appropriate. It is a judicial function to decide
> whether, under plaintiff's averment of the facts, recovery would be
> justified; and only after this judicial determination is made is the
> cause submitted to the jury to determine whether the facts of the case
> support the averments of the complaint.

Id.   To determine whether a product is unreasonably dangerous, courts "engage in a risk-utility

analysis, weighing a product's harms against its social utility."[6]   Surace v. Caterpillar, Inc., 111 F.3d

---

[5]Skirmish also argues that it is entitled to the entry of summary judgment in its favor with
respect to Martinez's claim of breach of the implied warranties of merchantability and fitness for a
particular purpose in Count IV of the First Amended Complaint on the ground that the goggles were
not unreasonably dangerous.  Martinez maintains that Skirmish breached the implied warranties of
merchantability and fitness for a particular purpose because the goggles it rented to him were poorly
maintained and had design defects that contributed to his eye injury.  Even though Martinez must
establish that the goggles were defectively designed in order to succeed on the latter aspect of his
breach of implied warranty claim, he need not establish that the goggles were unreasonably
dangerous, as that requirement arises solely in strict liability.  See Azzarello v. Black Bros., Inc., 391
A.2d 1020, 1026 (Pa. 1978) (noting that the phrase "unreasonably dangerous" is a term "of art
invoked when Strict liability is appropriate").  There is no such requirement for claims of breach of
the implied warranties of fitness for a particular purpose and merchantability.  Hittle v. Scripto-Tokai
Corp., 166 F. Supp. 2d 142, 157 (M.D. Pa.  2001) (noting that, while plaintiffs must show that a
product is defective in order to establish breach of the implied warranties of merchantability and
fitness for a particular purposes, the "product need not be defective as defined under strict products
liability in order to be not fit for ordinary purposes." (citing Azzarello, 391 A.2d at 1026)).
Consequently, we consider whether the goggles Skirmish rented to Martinez were unreasonably
dangerous only in connection with Martinez's strict liability claim.

[6]In his Response to Defendant's Expert Report and Other Submissions, Martinez suggests
that the Azzarello analysis is no longer necessary because, under the Restatement (Third) of Torts:
Products Liability, § 2, the risk/utility analysis falls within the province of the jury.  See Restatement
(Third) of Torts:  Products Liability, § 2, cmt. d, f.  Justice Saylor's concurring opinion in Phillips

1039, 1044 (3d Cir. 1997) (citation omitted).  The court considers "the gravity of the danger posed

by the challenged design; the likelihood that such danger would occur; the mechanical feasibility of

a safer design; and the adverse consequences to the product and to the consumer that would result

from a safer design."  Riley v. Warren Mfg., Inc., 688 A.2d 221, 224 (Pa. Super. Ct. 1997) (citing

Dambacher by Dambacher v. Mallis, 485 A.2d 408, 423 n.5 (Pa. Super. Ct. 1984)).   Our

consideration of these issues requires weighing the following seven factors:

> (1) The usefulness and desirability of the product - its utility to the user and to the public as a whole.
>
> (2) The safety aspects of a product - the likelihood that it will cause injury, and the probable seriousness of the injury.
>
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
>
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
>
> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

---

v. Cricket Lighters, 841 A.2d 1000 (Pa. 2003), may be read to suggest that the Azzarello framework, by which the court, rather than the jury, undertakes the risk/utility analysis, is outdated.  Id. at 1012-1021. However, the Third Circuit did not address this issue in Berrier, and Martinez has not submitted any "'relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data" that would convincingly demonstrate that the Pennsylvania Supreme Court would abandon the requirement that the court conduct this analysis before the case is permitted to go to the jury.  See Nationwide, 230 F.3d at 637.  Consequently, we decline to predict that the Pennsylvania Supreme Court would conclude that the pre-trial Azzarello analysis is no longer necessary.

> (7) The feasibility on the part of the manufacturer, of spreading the loss of [sic] setting the price of the product or carrying liability insurance.

Id. (quoting Dambacher, 485 A.2d at 423 n.5); see also Surace, 111 F.3d at 1047 n.7 (explaining that these seven factors encompass the first three factors listed in Riley).  If we conclude, after weighing the evidence in the light most favorable to Martinez, that the goggles were unreasonably dangerous, Martinez's strict liability claim will go to the jury, which will decide "based on all the evidence presented, 'whether the facts of the case support the averments of the complaint.'" Moyer v. United Dominion Indus., 473 F.3d 532, 539 (3d Cir. 2007) (citing Phillips v. A-Best Prods. Co., 665 A.2d 1167, 1171 n.5 (Pa. 1995) and quoting Azzarello, 391 A.2d at 1026).  The jury would not repeat our risk/utility analysis; rather, its role would be to determine whether the goggles "'left the supplier's control lacking any element necessary to make [them] safe for [their] intended use or possessing any feature that renders [them] unsafe for the intended use.'" Id. (quoting Phillips v. Cricket Lighters, 841 A.2d 1000, 1005 (Pa. 2003)).

The parties have asked us to conduct the Azzarello analysis based upon the record, including the opinions of their experts. (5/14/09 Hr'g Tr. at 19-21.)  We have, accordingly, considered the expert reports prepared by Dr. Bissell, Dr. Roch Shipley, and Dr. David Curry.[7]

       1.    The usefulness and desirability of the product

There is no dispute that goggles are both useful and desirable in connection with paintball activities.  Indeed, Dr. Bissell, has opined that "[i]t is well understood in the paintball community that it is highly likely that a paintball player will be struck in the eye by a paintball and injured if not

---

[7]Dr. Curry's report was submitted by Defendants Procaps Direct, Inc. and Procaps L.P. before those Defendants were dismissed from this action and it remains part of the record in this action.

protected by goggles.  Therefore, goggles are a necessary part of paintball equipment."  (5/26/09 Trident Rpt. at 12 ¶ a.)  ASTM International's Standard Practice for Paintball Field Operation, ASTM 1777, requires that "All persons . . . wear . . . paintball goggles with full face protection at all times while they are in areas designated as "goggles on areas."  ASTM 1777, ¶ 4.4.[8]  We conclude that goggles are useful and desirable in connection with paintball activities and that this factor weighs in favor of Skirmish.

## 2.    The safety aspects of the product

In weighing this factor, we must consider the likelihood that the use of VForce Armor Rental Field Black Goggles will result in injury and the probable seriousness of the resulting injury.  See Riley, 688 A.2d at 225.  It is clear that "a product is not defective simply because accidents may occur during its use."  Lancenese v. Vanderlans & Sons, Inc., Civ. A. No. 05-5951, 2007 WL 1521121, at *3 (E.D. Pa. May 21, 2007) (citing Berkebile v. Brantly Helicopter Corp., 337 A.2d 893 (Pa. 1975) and Pegg v. Gen. Motors Corp., 391 A.2d 1074 (Pa. Super. Ct. 1978)).  Courts consider "the actual rate of injuries caused by a particular product" when weighing this factor.  Id. (citing Monahan v. Toro Co., 856 F. Supp. 955, 958 (E.D. Pa., 1994)).  There is no evidence on the record of this Motion as to the rate of injuries caused by slippage of the VForce Armor Rental Field Black Goggles during paintball activity.  There is, however, evidence that VForce Armor Rental Field Black Goggles fail to comply with the specifications of ASTM 1776 that relate to vertical restraint and are intended to prevent goggle slippage.  (5/26/09 Trident Rpt. at 12 ¶ b.)  These specifications are designed to "minimize or significantly reduce injury to the eye and adnexa due to impact and

---

[8]ASTM 1777 defines "goggles on areas" to include "playing fields, game areas, chronograph areas, and target ranges."  ASTM 1777, ¶ 3.1.10.

penetration of paintballs."   ASTM 1776, ¶ 1.1.   "Paintball is an activity where projectiles are supposed to travel at speeds of 280 feet per second (or over 190 miles per hour) (ballistic speeds)." (12/8/08 Trident Rpt. at 5.)  Under these circumstances, it is highly probable that serious eye injury would occur if VForce Armor Rental Field Black Goggles slipped because they lack a vertical restraint and thereby failed to protect a wearer's eyes during paintball activities.   Weighing the evidence in the light most favorable to Martinez, we conclude that this factor weighs in his favor.

> 3.    Availability of substitute products and ability to eliminate unsafe characteristic of product

The third and fourth factors require us to examine other goggles available on the market and the cost of eliminating the unsafe characteristics of the VForce Armor Rental Field Black Goggles. The record indicates that there are several substitute goggles on the market that meet the vertical restraint specifications of ASTM 1776 and that would eliminate the risk of eye injury due to vertical slippage posed by the VForce Armor Rental Field Black Goggles.  Dr. Bissell has opined that the VForce Field Vantage Goggles comply with the vertical restraint requirements of ASTM 1776 and would cost Skirmish only two dollars more per pair than the VForce Armor Rental Field Black Goggles.[9]  (5/26/09 Trident Rpt. at 8.)  Dr. Bissell has also opined that the JT Headshield Goggles and JT Flex 8 Goggles both comply with the vertical restraint requirements of ASTM 1776.

---

[9]Skirmish has asked us to disregard Dr. Bissell's opinions about the availability of substitute products because "there are no scientific tests, no industry wide standards or studies, and no compilations of data in Plaintiff's expert's report which reveal that the goggles that were used by the Plaintiff on the day of the incident, as designed, were defective in any way."  (Skirmish Mot. at 36.) Skirmish is incorrect.  Dr. Bissell's opinion relies on his examination of the exemplar pair of VForce Armor Rental Field Black Goggles provided by Skirmish, other goggles available on the market, Martinez's testimony regarding the goggles he used on March 19, 2006, and the industry-wide standards provided in ASTM 1776 and 1777.  (12/8/08 Trident Rpt.; 5/29/09 Trident Rpt.)  We will, therefore, consider Dr. Bissell's opinions for the purposes of this Motion.

(5/26/09 Trident Rpt. at 9.)  Skirmish purchased two of the JT-Headshield Goggles and six of the JT-Flex 8 Goggles on November 7, 2005, prior to Martinez's injury.  (Pl. Ex. H.)   The JT-Headshield Goggles cost approximately seven dollars more per pair than the VForce Armor Rental Field Black Goggles, the JT-Flex 8 Goggles cost approximately 28 dollars more per pair than the VForce Armor Rental Field Black Goggles.  (Id.) Dr. Bissell has opined that, as Skirmish rents each pair of goggles hundreds of times, the cost to Skirmish of providing goggles that comply with the vertical restraint requirements of ASTM 1776 would not be prohibitively higher than the cost of providing VForce Armor Rental Field Black Goggles.  (5/26/09 Trident Rpt. at 12 ¶ e.)

Dr. Bissell has also opined that substitute straps are available on the market that do not pose the same risk of loosening, and consequent slippage, as the standard straps provided on the VForce Armor Rental Field Black Goggles.  (Id.)  Dr. Bissell states that Procaps Direct, Inc. sells a "zero-slip" head strap that uses "wavy silicon beading . . . to better engage the retaining clip which is used to adjust and hold the tension of the strap."  (Id. at 11.)  Use of the  "zero-slip" strap thus eliminates the need to readjust the goggles to prevent loosening of the strap and consequent slippage.  (Id.) Procaps Direct, Inc. sells the "zero-slip" replacement strap for $9.99.  (Id., Ex. f.)  Standard replacement straps for VForce Armor goggles are $5.99.  (Id.)  Weighing the evidence in the light most favorable to Martinez, we find that substitute products are available on the market that would eliminate the unsafe characteristic of the VForce Armor Rental Field Black Goggles, that these substitute products were available on the market at the time of Martinez's injury, and that the use of these products, or the replacement "zero-slip" strap, would not be unduly expensive.  We conclude that the third and fourth factors weigh in Martinez's favor.

35

4.      The user's ability to avoid danger

The fifth factor, the user's ability to avoid danger, "is an objective inquiry into whether the class of ordinary purchasers of the product could avoid injury through the exercise of care in use of the product, not whether this particular plaintiff could have avoided this particular injury."  Surace, 111 F.3d at 1051.  This factor is "not a vehicle for injecting a plaintiff's (alleged) failure to exercise due care into the case."  Id.  Skirmish contends that an ordinary user could have avoided danger by tightening the goggles.  Martinez never tightened his goggles and claims that he was unaware of the procedure for doing so.  (Martinez Dep. at 113.)  Dr. Curry has opined that the mechanism for adjusting the VForce Armor Rental Field Black Goggles "is intuitively obvious on casual inspection (i.e., sliding the buckles on the strap towards or away from each other)."  (Curry Rpt. at 10.)  Dr. Shipley has similarly opined that adjustment of the strap on the VForce Armor Rental Field Black Goggles "is obvious and similar to straps used in other types of protective eyewear and other products."  (Shipley Rpt. at 3.)

There is, however, additional evidence that tightening the strap on the VForce Armor Rental Field Black Goggles would not be sufficient to enable a user to avoid injury.  Dr. Bissell has opined that the defective design of the VForce Armor Rental Field Black Goggles would permit vertical movement, including slippage, during common paintball activities "such as sweating, brushing against tree and brush branches, running and stumbling."  (12/8/08 Trident Rpt. at 7 ¶ f.)  Dr. Bissell has also opined that the defective design of the strap used on the VForce Armor Rental Field Black Goggles would permit loosening of the goggles, leading to slippage, as a result of common paintball activities "such as sweating, brushing against tree branches, running and stumbling."  (Id. at 8 ¶ g.) Weighing the evidence in the light most favorable to Martinez, we find that the defective design of

the VForce Armor Rental Field Black Goggles could cause them to loosen and slip during common paintball activities, even after they had been tightened and, consequently, that an ordinary user could not avoid injury simply by tightening his or her goggles.  We conclude that this factor weighs in favor of Martinez.

### 5.    User's anticipated awareness of the product's inherent dangers

This factor focuses on "the user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction." Surace, 111 F.3d at 1052 (internal quotation omitted).  Dr. Bissell states that Martinez was not given any information or instruction by Skirmish regarding how to adjust the fit of the VForce Armor Rental Field Black Goggles or concerning the lack of vertical stability of these goggles.  (5/26/09 Trident Rpt. at 6.)  There is no evidence on the record before us that there was general public knowledge that these goggles lacked vertical stability as required by ASTM 1776.  We find, accordingly, that this factor favors Martinez.

### 6.    Feasability

"Although a manufacturer is usually able to spread the cost of a plaintiff's loss to all consumers of a product by raising the price of the product, the feasibility of doing so depends upon balancing the remaining factors in the risk/utility analysis." Lancenese, 2007 WL 1521121, at *5 (citing Riley v. Becton Dickinson Vascular Access, 913 F. Supp. 879, 880 (E.D. Pa. 1995); Monahan, 856 F. Supp. at 955 and Van Buskirk v. West Bend Co., 100 F. Supp. 2d 281, 289 (E.D. Pa. 1999)).  Consequently, "[i]f after examining the first six factors, the utility of the product outweighs its risks, then shifting the cost of the plaintiff's loss to the defendant is not fair, and therefore, not feasible." Id. (citations omitted).  We have determined that five of the first six factors

favor Martinez.  We conclude, therefore, that it would be feasible for Skirmish to spread the increased cost of replacement goggles to consumers, especially as the cost of goggles that comply with the vertical restraint specifications of ASTM 1776 is not significantly higher than the cost of VForce Armor Rental Field Black Goggles.  (Pl. Ex. H;  5/26/09 Trident Rpt., Ex. d.)

After weighing all seven of the Azzarello factors, we conclude that the defects in design of the VForce Armor Rental Field Black Goggles outweigh its social utility and, accordingly, that the VForce Armor Rental Field Black Goggles Skirmish rented to Martinez on March 19, 2006 were unreasonably dangerous.  Skirmish's Motion for Summary Judgment is, consequently, denied as to this issue, and this case will go to a jury to determine whether the VForce Armor Rental Field Black Goggles left Skirmish's "control lacking any element necessary to make [them] safe for [their] intended use or possessing any feature that renders [them] unsafe for the intended use.'" Moyer, 473 F.3d at 539.

## IV.   CONCLUSION

For the foregoing reasons, summary judgment is granted in favor of Skirmish and against Martinez with respect to Martinez's claim for negligence in Count I of the First Amended Complaint.  Summary Judgment is also granted in favor of Skirmish and against Martinez as to Martinez's claims for strict liability and breach of the implied warranties of merchantability and fitness for a particular purpose in Counts III and IV of the First Amended Complaint with respect to the paintball that struck his eye on March 19, 2006.

The Motion for Summary Judgment is denied as to Plaintiff's request for punitive damages; Plaintiff's claim for gross negligence in Count II of the First Amended Complaint; Plaintiff's claim for strict liability with respect to the VForce Armor Rental Field Black Goggles in Count III of the

First Amended Complaint; and Plaintiff's claim for breach of the implied warranties of merchantability and fitness for a particular purpose with respect to the VForce Armor Rental Field Black Goggles in Count IV of the First Amended Complaint.

An appropriate order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.